Linzay vs. Linzay.

No.13,045.

Minine Linzay, Wife, vs. Charles Linzay, Husband.

SYLLABUS.

1. Wife sues for separation from bed and board on the ground of harsh and: cruel treatment and conspiracy against her life. Husband denies her averments, and reconvenes asking judgment against her for separation, averring the same grounds, and in addition her public defamation of him.

2. Case is one of fact. Evidence not sustaining judgment below in favor of wife, same is reversed and the decree here awards husband the separation with custody of the children.

3. Even with the judgment as here pronounced the case has not gone so far as to destroy the belief and hope that a reconciliation may yet be effected, and the spouses brought together upon a basis of mutual forgiveness, forgetfulness and forbearance, and of common interest in their children of tender years.

4. The law wisely and humanely holds the door still ajar for them.

ON APPEAL from the Tenth Judicial District Court for the Parish of Rapides. *Hunter, J.*

*Robert P. Hunter* for Plaintiff and Appellee.

*Andrews & Hakenyos* for Defendant and Appellant.

Argued and submitted February 9, 1899.
Opinion handed down March 7, 1899.

The opinion of the court was delivered by

BLANCHARD, J. This is a suit by a wife for separation from bed and board, for custody of the two children of the marriage, for dissolution of the community of acquets and gains, and for judgment for one-half of the community property.

The grounds of the action are, harsh and cruel treatment by the husband of such a nature as to render their living together insupportable, and the allegation is made that the husband had threatened her life and conspired with others to kill her, and as the result of this conspiracy she was enticed to the barn on the premises where the couple lived and there shot with a pistol and wounded in the arm by a

concealed assassin, who endeavored to take her life, and that because of this attempt on her life she had been forced to leave the matrimonial domicile and seek shelter elsewhere.

The husband denies all this, represents that the wife is not a fit person to have custody of the children, and contests her right to them.

Becoming plaintiff in reconvention, he avers that the conduct of the wife entitles him to a judgment of separation from bed and board; that she, herself, had been unkind, cruel, harsh and abusive, disregardful of his rights, had set his will and authority at defiance, had destroyed his peace of mind and the happiness of his home, and rendered their living together insupportable; that she had defamed his character by charging him before a magistrate as being accessory to the crime of attempting to murder her; that she had purposely shot herself on the occasion averred by her in order to lay the basis for the slanderous charge against him; that she had previously brought two suits against him for divorce, both of which she had abandoned without trial; and that instead of the community being indebted to her, he was its creditor to the extent of one thousand dollars for money and property owned by him at the time of the marriage and which went into the community.

He prayed for judgment in accordance with the averments of his answer.

The decision below was in favor of the plaintiff granting her a decree of separation from bed and board, dissolving in her favor the community of acquets and gains, giving her custody of the children of the marriage and directing that she recover of the husband twelve hundred and seventy-one and 60-100 dollars as her share of the community property.

Defendant appeals.

The case is one of fact. We may class the complaint of the wife under two heads:

1. Harsh and cruel treatment.

2. An attempt by the husband upon her life through a hired assassin lying in wait in the barn.

Both these charges are serious enough, but the enormity of the latter, if true, makes it an atrocious crime, for which the infliction even of the severest penalty known to the law upon the guilty culprit would be a punishment too light.

We have gc.ie over the evidence found in the record with care and pains, and over the discussion of it in the briefs of counsel with close attention, but in this opinion, intended more as a statement of facts and of the conclusions arrived at, we decline to go into any lengthy discussion of the nauseous details of this narrative of marital infelicity.

There is a proneness on the part of masculine human nature, from which even judges are perhaps not entirely exempt, to lean in sympathy to the side of the wife and mother in these cases of domestic trouble and controversy. But even with this "coign of vantage" in her favor, we have been unable to reach the conclusion that this wife has made out her case, or is entitled to the judgment entered up in her favor below.

With regard to the alleged attempt upon her life by the husband, in conjunction with a hired assassin, we reject the story in toto. There is neither any direct proof of it, nor yet any showing of a chain of circumstances warranting a moment's belief in its verity.

Not only that, but we regard it as disproven. We acquit the husband of any participation in it. The conviction, most unwillingly, is forced upon us that she shot herself, and that her motive was to manufacture a case against her husband, to the end of bringing him to punishment and enabling her to succeed in a purpose, long formed, and twice before attempted by proceedings in court, of securing a legal separation from him.

The wound was a slight flesh wound in the left fore-arm and shown by the evidence of a physician attending her to have been possible of self-infliction. The shooting occurred at the barn some sixty yards from, and towards the front of the house, occupied by the family. It was three o'clock in the afternoon. Miss Somers, a young lady friend of the wife who was visiting her, and the two children, were in the house at the time. The husband was in the field near by engaged in the work of hauling his cane to the sugar refinery. The railroad ran near and in front of the house, and nearer still to the barn. Neighbors lived oposite, across the railroad, not more than 250 yards away. Others (colored people) lived within 150 yards of the barn. The pistol from which the shot was fired was so close to the lady when fired that the sleeve, covering the arm, was powder-burned. She claimed she was shot while in the barn or crib looking for chickens, and that it was at the instance of the husband she had gone

there looking for chickens. This barn had but one door. After the shooting she came out of this door crying "murder." No one else was seen to come out of that door. She went over to the railroad and to the house of John Brogdan just beyond. A physician and her husband were sent for. Both came. She accused the husband of conspiring to have her shot and wanted to go at once to a magistrate to sue out a warrant against him. She told Brogdan and others she had been shot by a negro named Tom Allen, who wore a green shirt, that he was concealed in the barn, and that after shooting her he ran out under the crib.

Brogdan and her brother, who had also come to where his sister was, repaired to the barn to investigate.

They found no tracks leading in or out of the barn, or around it, except those of the lady. Sugar cane grew near the barn. They went to this, taking row by row, searching for tracks, but found none. Inside of the barn they found much corn, but no place where an assassin could have been concealed. At one spot where there was little or no corn they found a small hole caused by one or two planks being prized up, but this is shown to have been done some days before and the hole was entirely too small to conceal a man, or for a man to get into, and from the floor of the crib to the ground the space was only six or eight inches, entirely insufficient to enable a man either to effect an entrance into, or make his exit from, the crib through it. Before going to the barn Brogdan and the brother had been told by the wounded lady that two pistols were kept in her bed room, one on the mantel, another on a nearby shelf. She said one of these pistols was charged with five cartridges, the other with three. They went to the house, searched for these pistols, found the one with five chambers loaded, but did not find the other. They repaired then, a second time to the barn, and Brogdan, making a closer inspection of the hole in the floor, getting down and looking well into it, discovered a pistol lying back under one of the sleepers of the floor. He called to the brother, the pistol was taken out, examined, one shot was found to have been recently fired from it, and it was identified as the "other" pistol missing from the house. The brother, thereupon, declared his belief his sister had shot herself, and on going back to Brogdan's house, which he and Brogdan immediately did, he told her she had shot herself, adding, "we don't think you shot yourself with murderous intent, but you undoubtedly shot yourself." This is the testimony of Brogdan,

and while the brother does not commit himself so broadly in his testimony, he admits he thought she had shot herself.

Tom Allen, the colored man, was produced as a witness, and testified he did not do the shooting, that he was at work all that afternoon cutting cane, some 600 yards distant, with a number of other men, one of whom was Mr. Sessions, a white man, his employer. Sessions and others were called as witnesses and proved conclusively that Allen was with them all that afternoon from 1 o'clock until 6 o'clock.

Other facts might be detailed supporting the husband's contention in regard to this shooting, but the foregoing will suffice.

The attempt on part of the wife to make it appear that it was he who had taken the pistol from the house and given it to the assassin, fails entirely.

With regard to the alleged harsh and cruel treatment of the wife by the husband, and of excesses on his part rendering their living together insupportable, the wife's case rests upon the testimony of Miss O'Q————. But her evidence is discredited in so many ways we can give little or no effect to it, and regard it altogether insufficient to support the judgment appealed from.

This lady is a distant relative of the defendant husband. She appears to have resided at the home of the Linzays for some five or six months, or until requested by him to leave. When she did leave,. she continued in the neighborhood, though her residence was in another parish. The wife, having also left the matrimonial domicile after the shooting at the barn, Miss O'Q———— remained with her, was her close, intimate friend and ally, went with her to town to institute these legal proceedings, and it is plain that she was a witness greatly biased in favor of the wife and with strong prejudices against the husband. This, standing alone, would not render her testimony nugatory, though it would weaken its effect. But it does not stand alone.

We find her, in various and important particulars of her evidence, contradicted by Mrs. John Brogdan, by John Brogdan, by the two Barkers, by Miss Gertie Linzay and by James Linzay, all of whom testified in the case. It amounts to an impeachment of her testimony. *Falsus in uno, falsus in omnibus.*

Leaving it out, or giving it but scant consideration, the case of the· wife falls.

We would the case could end here, and by a denial of the demands· of each, leave this husband and wife where they have placed them-

selves, trusting to the mellowing influences of time to soften the asperities and allay the bitterness engendered between them, and pave the way to an ultimate reconciliation, always the more desirable where there are, as here; small children to rear, to train and to educate.

But the husband's claim to a judgment of separation remains to be considered, and if well-founded we have no option and must sustain it.

In considering the wife's case we have been obliged to hold, as to that branch of it relating to the attempt upon her life, that not only was there no attempt against her life by the husband or any one acting with or for him, but that no attempt whatever by any one *had been made* against her life. And, further, that the shooting, as the result of which she was slightly wounded in the fore-arm, was her own intentional act, inspired by the motive to denounce her husband, to bring him to punishment, and to make a case against him for the dissolution of her marriage, with the resultant effect of awarding her the custody of the children and a part of the community property.

We find that following this shooting of herself, she did denounce her husband to the officers of the law, made affidavit, charging him with the crime and caused his arrest.

This was not only an unfounded charge, but she knew it to be unfounded, and it constitutes public defamation of the husband, and is legal ground on his part for a judgment of separation. C. C. 138; Cass vs. Cass, 34 La. Ann., 611.

His case is, therefore, made out.

Separation from bed and board carries with it separation of goods and effects. C. C. 155.

This means there must be between these spouses a settlement of community affairs as well as a dissolution of the community. We will not disturb that portion of the judgment below which awards the wife $1,271.60 as her share of the community property, and we think she is entitled to 5% interest thereon from the rendition of that judgment, as decreed by the court *a qua*.

The children of the marriage must be placed under the care of the husband, in whose favor the judgment of separation is awarded.

Such is the mandate of the law. C. C. 157.

Even with the judgment as herein pronounced, the case has not gone so far as to preclude the belief and hope that a reconciliation may yet be effected, and these spouses brought together upon a basis

of mutual forgiveness, forgetfulness and forbearance, and of common interest in their children of tender years. The law wisely and humanely holds the door still ajar for them.

For the reasons assigned, it is ordered, adjudged and decreed that the judgment appealed from, except as hereinafter stated, be annulled, avoided and reversed, and it is now ordered and decreed that the demand of the plaintiff herein for separation from bed and board from her husband, defendant herein, and for custody of the children of the marriage, be rejected.

It is further ordered, etc., that there be judgment in favor of Charles Linzay, husband, and against Minnie Linzay, wife, of separation from bed and board and of separation of goods and effects, and dissolving the community of acquets and gains existing between them, and placing under his care the two children, issue of their marriage.

It is further ordered, etc., that the wife, Minnie Linzay, be permitted to see the children and have such access to them as may be reasonable and advisable, under such regulations as to time, place, frequency, duration, etc., as may be made therefor by the court a qua, to which the case is remanded for that purpose, and for the execution of this judgment.

It is further ordered, etc., that so much of the judgment appealed from as awards to the plaintiff herein à decree to recover from defendant twelve hundred and seventy-one and 60-100 dollars, with legal interest from December 3, 1898, until paid, as her share of the community property, be affirmed—costs of both courts to be taxed against plaintiff and appellee.